# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

In re

**MISTY REED RETZ**,                              Case No.  **04-60247-7**

          Debtor.

# MEMORANDUM OF DECISION

At Butte in said District this 19th day of March, 2008.

In this Chapter 7 case the Trustee Richard J. Samson ("Samson") filed on October 9, 2007, a motion (Docket No. 96) to approve an "Agreement Regarding Sale Proceeds" (hereinafter the "Agreement") entered into between the bankruptcy estates of the Debtor Misty Reed Retz ("Misty") and that of her former spouse and Chapter 7 debtor Brendon K. Retz ("Brendon"), Timberland Construction, L.L.C. ("TCLLC") and TCLLC's current owner Donald G. Abbey ("Abbey"). Objections were filed by the Debtor and by Debtor's former mother-in-law and Brendon's mother Jo Ellen Retz ("Jo Ellen"). A hearing on approval of the Agreement was held after due notice at Missoula on February 7, 2008, at which the parties appeared represented by counsel and testimony and exhibits were admitted. At the conclusion of the parties' cases-in-chief the Court granted the parties time to file simultaneous briefs, after which the matter would be taken under advisement. The parties' briefs have been filed and reviewed by the Court, together with the record and applicable law. This matter is ready for decision. For the reasons set forth below the objections filed by Misty and Jo Ellen will be overruled, the Trustee's motion to approve the Agreement will be granted and the Agreement will be approved by separate Order.

1

This Court has jurisdiction of this Chapter 7 case under 28 U.S.C. § 1334(a).  The

Trustee's motion to approve settlement is a core proceeding under 28 U.S.C. § 157(b)(2).  This

Memorandum includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P.

7052.

The Trustee Samson appeared and testified in support of the settlement Agreement.

Misty Retz appeared and testified in opposition, represented by attorney Harold V. Dye ("Dye")

of Missoula, Montana.  Jo Ellen was represented by attorney James A. Patten of Billings,

Montana.  Abbey appeared and testified in support of the Agreement represented by attorneys

Edward A. Murphy of Missoula, Montana, and Michael G. Black of Missoula, Montana.

William Matteson ("Matteson"), who was employed by Abbey in 2003 to investigate TCLLC,

also testified.  Debtor's Exhibits ("Ex.") 4, 5, 6, 7, 11, 13, and TCLLC's Ex. 11, 12, 19, 20, 22,

23, 24, 26, 27, 28, and 36 were admitted into evidence without objection.

## FACTS

Brendon and Abbey entered into a real estate development business arrangement whereby

Brendon's corporation Timberland Construction, Inc. ("TCI") and Brendon became members of

TCLLC, with Abbey owning 50%.   They entered into TCLLC's Ex. 12, the "operating

agreement" for TCLLC, dated retroactive to July 1, 2001, and signed by Brendon as TCI's

president and by Abbey as governing members.  Ex. 12, p. 49.  Samson testified that he reviewed

the operating agreement, and reviewed and relied on the trial transcript of Abbey's adversary

proceeding against Brendon, Adv. No. 05-00018, a portion of which was admitted into evidence

as TCLLC's Ex. 11.

Samson, Abbey, and Matteson each testified that Brendon's and TCI's capital

2

contributions into TCLLC were to include a house at 650 Woodside Lane,[1] Whitefish, Montana. Samson testified that 650 Woodside was transferred to TCLLC by deed in June or July of 2002. The trial transcript from Adv. No. 05-18 includes Brendon's testimony at pages 478-79 that 650 Woodside was transferred to TCLLC by means of the operating agreement, and that Brendon was not aware of any subsequent written transfer of 650 Woodside out of TCLLC other than "[j]ust the accounting entries." TCLLC's Ex. 11, pp. 478-79, 504. Schedule 12.26 of TCLLC's Ex. 12 at 12098 and 12120, show subsidiary ledgers which list a construction loan against 650 Woodside in the amount of $63,634.00, and at 12099 and 12121 list a land note on Lot 6 Woodside with a balance of $22,000[2].

Paragraph 5.4.1 of the operating agreement, Ex. 12, at pages 16-18, states that the day-to-day operations shall be managed by Brendon, but at page 17 defines "Major Decisions" that fall outside the scope of TCLLC's day-to-day operations and require Abbey's written consent, including but not limited to:  (b) distributions (c) incurring or guaranteeing indebtedness, (f) determination of compensation of officers of the company or any of its operating LLC's, (g) determination of compensation of "Significant Employees", (h) approval of any transaction not identified in the applicable budgets, (k) disposal, sale, exchange or liquidation of assets of the company or its operating LLC's,  (t) any transaction between TCLLC or an operating LLC and any governing member, representative or affiliate of a governing member.

Loans are governed by paragraph 4.3 on page 13 of TCLLC's Ex. 12, and require full

---

[1]650 Woodside is also described as Lot 6 of Woodside Subdivision, Flathead County, Montana.  Debtor's Ex. 11.

[2]Ex. D to TCLLC's Ex. 12, at 12126-7 includes a deed and trust indenture showing TCI's acquisition of Lot 6 in 1999.

disclosure and prior approval of the governing members.  Paragraph 9.5 on page 36 of TCLLC's Ex. 12 requires separate bank accounts in the name of TCLLC, and prohibits commingling of company funds with funds of any other person.  Brendon was not authorized under the operating agreement to sell or convey property on behalf of TCLLC, enter into transactions with the company or write checks greater than $5,000, or any other "Major Decision documents" without Abbey's written approval.  Ex. 12, p. 22, paragraph 5.11.4.

Page 45 of the operating agreement includes paragraph 14.2, which provides that it and other concurrent written agreements are the complete and exclusive statement of agreement "and replace and supersede all prior written and oral agreements" by and between the members. TCLLC Ex. 12.  Paragraph 14.14 on page 47 of the operating agreement requires that any amendments to the operating agreement must be in writing and signed by all members.  No written amendments to the operating agreement exist, and Abbey never gave up any of his rights under TCLLC's Ex. 12.

Samson testified that, when the operating agreement was signed, 650 Woodside was in TCI's name, not Brendon's or Misty's, but that Brendon subsequently deeded 650 Woodside to himself and Misty as joint tenants.  Matteson testified that 650 Woodside was still an asset of TCLLC in July of 2003, pursuant to the terms of the operating agreement even though Brendon had never actually deeded the property to TCLLC.  Debtor's Ex. 11 is a deed signed by Brendon on July 3, 2002, as TCI's president, conveying Lot 6 of Woodside Subdivision[3] to Brendon and Misty.  That deed was recorded in Flathead County on July 5, 2002.

---

[3]Lot 6 Woodside Subdivision is 650 Woodside.  Ex. 19, the loan application signed by Brendon and Misty, states that 650 Woodside is described as Lot 6 Woodside Subdivision.

Abbey hired Matteson in August of 2003 to represent him in investigating fraud and defalcation by Brendon in TCLLC[4]. Matteson traveled to Montana to investigate TCLLC. Litigation commenced between Abbey and Brendon in state court beginning around August of 2003. Misty testified that she was aware of a receivership arising out of the state court litigation, and of a court order prohibiting Brendon from transferring property of TCLLC.

Brendon and Misty had moved into 650 Woodside. Abbey testified that Brendon was required by the operating agreement to pay TCLLC rent on property Brendon was occupying, but he never paid rent. Abbey also testified that the operating agreement required his signature in order for TCLLC to sell or apothecate property, and that he never granted permission for any transfer.

Matteson testified that he was employed by Abbey to represent him and investigate possible financial fraud and defalcation in TCLLC, whether assets were to have been contributed to TCLLC had been contributed, and overcharges on Abbey's Shelter Island project. Matteson arrived in Montana in August 2003 and reviewed TCLLC's books and real estate dealings, including all real estate which was to be contributed to TCLLC by Brendon. Matteson testified that he learned around the end of September 2003 that 650 Woodside had been deeded to Brendon and Misty. Matteson testified that the transfer of 650 Woodside by Brendon to himself and Misty constituted a transfer of TCI's capital contribution out of TCLLC. Abbey testified that he did not learn of the transfer of 650 Woodside out of TCLLC by Brendon until after the state court litigation with Brendon commenced.

Brendon signed the deed, Debtor's Ex. 11, right below a provision stating that the transfer

---

[4]Abbey testified that he later put Matteson in charge of Abbey's operations.

of 650 Woodside to himself and Misty was pursuant to a resolution of TCI's board of directors. Brendon admitted at trial in Adv. No. 05-18 that he was not aware of any such corporate resolution, and that he did not request written consent from Abbey for the transfer of 650 Woodside to himself and Misty.  TCLLC's Ex. 11, pp. 482, 487.

Misty testified that she and Brendon purchased 650 Woodside, and that she was aware of the purchase at the time but was not aware of any cash which she contributed for the purchase. She testified that she and Brendon paid off the debt and took out a new mortgage against 650 Woodside, exchanged other property for it, moved in and lived in 650 Woodside, and serviced the debt owed on it.  Other than this purchase, she testified that they did not integrate all their finances together when they got married.

On cross examination Samson was asked what TCLLC received when Brendon deeded 650 Woodside from TCLLC to Brendon and Misty, and Samson answered that the debt against 650 Woodside was paid off.  Ex. 19 is a residential loan application in the sum of $121,000 signed by Brendon and Misty dated June 24, 2002.  Samson and Misty testified that Ex. 19 is for a loan taken out against 650 Woodside, with no down payment made at the time of the loan application because of the existing equity in the home.  Ex. 20 is a promissory note to Whitefish Credit Union dated June 27, 2002, in the amount of $121,000 signed by Brendon and Misty, indicating that it is secured by a deed of trust on 650 Woodside.  Despite Ex. 20's statement that they are giving a security interest in 650 Woodside, Misty testified that she never wrote a mortgage on 650 Woodside.  The note is payable in monthly payments in the amount of $895.00 beginning August 2, 2002.  Ex. 20.

Ex. 22 is a Whitefish Credit Union statement for Brendon's account number 818211 for

6

the period from January 1, 2003, through June 30, 2003.  Ex. 22 reflects $895.00 automatic

withdrawals on January 2003 and February 2003.  Ex. 23 is a Whitefish Credit Union statement

for Brendon's account dated 8/30/05 on Account No. 81821-1, showing several $895.00

automatic withdrawals beginning 8/2/02 and the last one dated 2/3/03.

Samson and Misty both testified that Misty did not contribute any cash for the purchase

of 650 Woodside.  Ex. 24 is a copy of Misty's Whitefish Credit Union statement dated 8/30/05,

reflecting activity from 3/21/03 to 6/30/05.  Samson testified that Ex. 24 shows no $895

payments on the note on 650 Woodside, and he was not aware of any other accounts from which

Misty made any $895 payments on the note.

Misty testified that she and Brendon took over the debt against 650 Woodside, and

exchanged equity they owned in a lot called the "Bearberry" lot.  Misty testified that she and

Brendon were planning to build on Bearberry, but instead they transferred the lot to TCLLC for

650 Woodside in an exchange of equity for equity, because customers came in looking for a lot.

Misty testified that documentary evidence exists of the transfer of the Bearberry lot in exchange

for 650 Woodside, but she did not produce such evidence at trial.

Matteson testified that he was employed to represent Abbey and investigate possible

financial fraud and defalcation in TCLLC, whether assets which were to have been contributed to

TCLLC had been, and overcharges on Abbey's Shelter Island project.  He reviewed TCLLC's

books and real estate dealings, including all real estate which was to be contributed to TCLLC by

Brendon.  Matteson testified that TCLLC, in the course of its operations, had acquired

"Bearberry" which he described as undeveloped land in Whitefish.  Matteson testified that his

investigation into TCLLC's records did not show that Brendon and Misty ever had an interest in

the Bearberry lot, and that he never heard of any equity trade of Bearberry for 650 Woodside. Abbey testified that he was not aware of Misty's claim that she and Brendon exchanged equity for 650 Woodside until Misty testified at trial, and that he did not give written approval of any exchange of equity in 650 Woodside by TCLLC as required under the operating agreement.

In 2003, after their child was born in August, Brendon and Misty sold 650 Woodside to Brendon's brother Ryan for the sum of $160,000 as part of their effort to entice Ryan to move to Whitefish to work for TCLLC. On cross examination Abbey agreed with his deposition statement that he became aware Ryan was living in 650 Woodside in June or July of 2003 when he came to Montana. Abbey testified that the operating agreement gave him the right to approve employment, that he was never asked, never informed of and never approved Ryan's employment by TCLLC. Despite the state court order prohibiting sale, Misty testified that she was under the impression that the state court ordered the sale by the receiver. She testified that the $160,000 selling price to Ryan was a "great deal" at the time the sale closed, but that they had agreed on the price and other terms much earlier when they agreed to sell 650 Woodside to Ryan, and that was why the buy-sell with Ryan was backdated.

Brendon was held in contempt of the state court by order entered November 20, 2003, for liquidating a stock account that was to have been contributed to TCLLC. Ex. 27. The court suspended the contempt sanctions on several conditions, including that Brendon not transfer any property for 90 days. The settlement statement for the sale to Ryan was admitted as Ex. 26, dated November 24, 2003, and was signed by Brendon and Misty as sellers, and by Ryan, on page 3.

Misty Retz filed her Chapter 7 petition and Schedules on February 6, 2004, and filed her Schedules and Statements on March 1, 2004. Misty did not list an interest in 650 Woodside in

her Schedule A, but did list a half interest in 665 Woodside Lane[5] in Whitefish, Montana.  Ex. 28.  Misty's Statement of Financial Affairs did not include any reference to the transfer of 650 Woodside to Ryan.  Samson testified that no amendments to Misty's Schedules and Statements have been filed, and he concluded that Misty made no claim of ownership to 650 Woodside in her Schedules.  Samson testified that in his opinion 650 Woodside was not property of either Misty's or Brendon's bankruptcy estates on the dates they filed their petitions.  Misty testified that she would have told Samson about the exchange of the lot and release of debt against the lot in exchange for her purchase of 650 Woodside, if he had asked.

Samson filed an application to employ himself and his law firm as attorney for the Trustee, which was granted by Order entered on March 1, 2005.  He testified that he met with Abbey's representatives and discussed the case.

Samson testified that three creditors are scheduled in Misty's case:  Abbey, Jo Ellen and a $900 credit card debt.  The claims register reflects 6 proofs of claim.  Whitefish Credit Union filed Claims Nos. 1 and 2 asserting secured claims.  Capital One Bank filed Claim No. 3 asserting an unsecured nonpriority claim in the amount of $964.72.  Claim No. 4 is a secured claim filed by Glacier Bank.  Abbey filed Proof of Claim No. 5 asserting an unsecured claim in the amount of $110,000.00 based upon "fraud" and fraudulent transfer of equity in 650 Woodside, to which Misty filed an objection.  Jo Ellen filed Claim No. 6 asserting an unsecured claim in the amount of $91,497.50 to which Abbey filed an objection[6].

On May 12, 2006, the Court entered an Order, Ex. 4, approving a settlement between the

---

[5]665 Woodside was abandoned by the Trustee on April 20, 2007.

[6]Both objections to claims are pending and will be decided separately.

9

Debtor, Trustee, Abbey and Jo Ellen resolving Adversary Proceeding Nos. 05-00017 and 05-00019, and other claims after no objections were filed. A discharge was entered in Misty's case on December 4, 2006.[7]

**Adversary Proceeding No. 05/00005.**

Adversary No. 05/5 was initiated by Abbey and TCLLC against Ryan James Retz, Misty's former brother-in-law, on January 6, 2005. Abbey and TCLLC amended their complaint several times. The third amended complaint filed November 11, 2005 (Ex. 4) includes, in addition to Counts I (seeking exception from discharge) II and III (objecting to discharge), a factual allegation[8] at page 9, paragraph 20, that Brendon and later Ryan held 650 Woodside in constructive trust for the benefit of TCLLC pursuant to MONT. CODE ANN. ("MCA") § 72-33-219[9]. The prayer of Ex. 4 requests exception from discharge and denial of discharge, but does not specifically pray for imposition of a constructive trust.

Samson, as Trustee for Brendon's and Misty's bankruptcy estates, moved for leave and was allowed to intervene (Ex. 13) in Adversary No. 05-05. Samson's third party complaint against Ryan (Ex. 5) sets forth a claim to recover 650 Woodside from Ryan on the grounds its transfer from Brendon and Misty constituted a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)

---

[7]The U.S. Trustee commenced an adversary proceeding, No. 07-00084, on December 3, 2007, to revoke Misty's discharge. Trial in Adv. No. 07-84 is scheduled to commence on July 8, 2008.

[8]Each of the three Counts of the Third Amended Complaint includes reallegation of paragraph 20 along with the other factual allegations. Ex. 4.

[9]MCA § 72-33-219 provides: "A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it."

and was recoverable under 11 U.S.C. § 550.  Samson testified that he did not allege actual fraud

by Ryan, and he did not assert any claim against Abbey.

   Samson testified that he investigated the background of Ryan's acquisition of 650

Woodside by reviewing documents and transcripts, and spoke with Abbey's attorneys.  On cross

examination Samson testified that he did not speak with Brendon, Misty, Dye, Patten or

Matteson, did not review Matteson's deposition, and did not review any financial accounting of

TCLLC regarding 650 Woodside.

   On January 19, 2006, Dye representing Ryan reported to the Court a Settlement

Agreement dated January 18, 2006, resolving Adv. No. 05-5 (Ex. 6).  Samson testified that there

"was a lot of thought given" to that settlement, and that Ex. 6 speaks for itself.   In Ex. 6 Ryan

confessed judgment on the Trustee's third party claim, admitted that he acquired 650 Woodside

when Brendon and Misty were insolvent or became insolvent as a result of the transfer, and that

he paid less than a reasonable equivalent value for the property.  Ryan agreed to deliver a quit

claim deed conveying 650 Woodside to the Samson as Trustee for the estates of Misty and

Brendon, and Samson agreed not to record the quit claim deed unless Ryan failed to sell the

property by June 30, 2006.

   Samson testified that Ex. 6 provided for a formula to divide the proceeds from the sale of

650 Woodside with Ryan.  He testified that he did not expect to take possession of 650

Woodside as part of the settlement, but rather expected only to receive the cash proceeds.

However, Samson testified that he never considered Ex. 6 to include his consent that all the

proceeds from 650 Woodside became property of Misty's estate.

   Ex. 6 includes a provision stating that the agreement shall not be deemed an admission of

liability. Samson testified that he does not believe there is an "integration clause" in Ex. 6, and that Ex. 6 is silent with respect to whether TCLLC reserved a right to claim an interest in the proceeds from the settlement of Adv. No. 05-5. Ex. 6's final provision is paragraph 10 which provides: "Abbey shall dismiss his claims in Adversary Proceeding No. 05-00005 with prejudice upon execution of the Confession of Judgment referenced in Paragraph 3 herein, and delivery of the Quitclaim Deed provided in Paragraph 5, herein." The Court approved Ex. 6 by Order (Ex. 7) entered on May 1, 2006.

Samson testified that Ryan performed under Ex.6, and that he received Ryan's assistance and proceeds from the sale of 650 Woodside in May of 2006. In May of 2007 Samson paid Ryan in accordance with Ex. 6[10]. In addition to the payment, Samson testified that he believes Ryan received dismissal of all claims against him by Abbey in Adv. No. 05-5[11].

Samson began negotiations with Abbey and TCLLC regarding the remaining funds which were his possession as Trustee of Brendon's estate in the amount of approximately $75,000. Samson testified that Ex. 6 did not address how to deal with the $75,000 after Ryan received his share, and answered "No" when asked whether Ex. 6 precludes TCLLC from making a claim against the $75,000 in proceeds. On cross examination Samson testified that he is acting as Trustee of both Brendon's and Misty's estates in the settlement. He admitted that it is possible

---

[10]An order entered on May 1, 2007, Docket No. 209 in Adv. No. 05-5, directed Samson to pay Ryan the amount of $9,130.73, and to retain the remaining $75,000 until subsequent order.

[11]Dye requested the Court take judicial notice of the docket in Adv. No. 05-5. The parties' reports filed in Adv. No. 05-5 in January 2008 (Docket Nos. 216 and 218) both state that only the instant dispute regarding the disposition of the proceeds remains. Abbey's report, Docket No. 218, states at page 2: "All issues regarding Ryan Retz are moot." Thus, technically Ryan has not yet received dismissal of all claims with prejudice, but under the settlement agreement Ex. 6 all claims against Ryan must be dismissed with prejudice.

that half of the proceeds could be in Misty's estate.

**The Pending Settlement Agreement – (Docket No. 96).**

Samson negotiated a settlement with TCLLC and Abbey regarding the remaining $75,000 in proceeds. He testified that they agreed to split the $75,000 remaining from the settlement by dividing it 80 percent (80%) to TCLLC and 20% to the Trustee. Currently, Samson testified, Misty's estate has some funds to administer from the liquidation of other assets, but any distribution to creditors could be reduced if Samson must litigate the ownership to the $75,000 in settlement proceeds.

Samson submitted the instant Agreement for approval in Brendon's bankruptcy case. He testified that Brendon did not object, and the Agreement was approved in Brendon's case without objection[12].

Samson filed his pending Motion to Approve Settlement Regarding Sale Proceeds in the instant case on October 9, 2007. In his Motion (Docket No. 96) Samson concurs that the $75,000 proceeds from the sale of 650 Woodside should be divided $15,000.00 for Brendon's estate and $60,000.00 to TCLLC, because 650 Woodside "was or should have been owned by" TCLLC.

The pending Agreement begins with several recitals, including the second recital on page 2 that "no agreement was concluded regarding claims of any other party to the proceeds received by the Trustee" from the sale of 650 Woodside under the settlement Ex. 6. On page 3 under

---

[12]Jo Ellen Retz filed an objection to Samson's motion to approve the settlement in Brendon's Case No. 04-60302-7, contending that Abbey is not entitled to any of the proceeds. Jo Ellen withdrew her objection in Brendon's case, reserving her rights to object in Misty's case. The Court approved the Trustee's motion in Brendon's case on December 12, 2007.

13

"Division of Proceeds and Other Considerations," the Agreement lists at paragraph 1 the division of proceeds – $15,000.00 to Brendon's estate; no funds to Misty's estate; and $60,000.00 to TCLLC – then provides for a release and settlement of specified claims related to the rights to the proceeds of the sale of 650 Woodside from Ex. 6, but does not release claims not specifically identified or TCLLC's and Abbey's claims against Brendon.  At page 4 the Agreement provides at paragraph 7 an "Entire Agreement" clause[13], and at paragraph 8 a provision for attorneys' fees and costs to the prevailing party in any adjudication of construction or interpretation of the agreement.

Misty filed an objection to approval of the Agreement on the grounds that her estate would receive none of the proceeds because they would all go to Brendon's estate and Abbey under the Agreement, and so it cannot be fair and equitable.  Misty objected that a constructive trust cannot be imposed against the bankruptcy trustee because of his "strong arm" powers as a bona fide purchaser for value under § 544, that TCLLC's claim for constructive trust is barred under the statute of repose, MCA § 31-2-341, since the transfer of 650 Woodside took place in 2002 and TCLLC knew of the transfer by the fall of 2003.  She objected that TCLLC's constructive trust claim is barred for failure to assert it as a "compulsory cross claim" in Adv. No. 05-5, that the settlement in that case did not reserve TCLLC's right to claim any of the proceeds, and therefore that the first factor for approval of settlements described in *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), i.e., probability of success on the merits, is not satisfied.  Misty also objected that the fourth *A & C Properties* factor is not satisfied because the

---

[13]Paragraph 7 provides:  "Entire Agreement.  This Agreement Regarding Sale Proceeds constitutes the entire agreement between the parties, and supersedes any oral communications, negotiations, or agreements between the parties."

14

Trustee seeks to turn over all the proceeds to third parties and nothing to Misty's creditors, out of expediency or insufficient analysis of the merits. Jo Ellen joined Misty's objection and argued that Abbey should receive none of the proceeds.

At the hearing Samson testified that, based on his investigation, he concluded that TCLLC had a claim to the remainder of the proceeds from Adv. No. 05-5 on the basis of constructive trust. He testified that he believes that TCLLC is the owner of the property, that the roots of 650 Woodside were in TCI, not in Brendon or Misty, that his investigation provided no indication that Brendon and Misty made any payments for 650 Woodside, and he testified that he does not believe that Misty or her creditors should benefit again from the fraudulent transfer of 650 Woodside by Brendon and Misty to Ryan.

Samson testified that he did not speak with Misty, Brendon, Joe Ellen's attorney Patten, Dye, or Matteson as part of this investigation into the pending settlement with Abbey and TCLLC, and did not review TCLLC's financial accountings, but that he did review documents and trial transcripts. Samson testified that, despite the settlement of Adversary No. 05-5, TCLLC still claims the proceeds from 650 Woodside under a theory of constructive trust, that in a F.R.B.P. Rule 7001 declaratory judgment action a court could consider TCLLC's claim of ownership to the proceeds notwithstanding the settlement in Adversary No. 05-5, and that in such an action the court would not be determining what was fair and reasonable in determining ownership of the proceeds. On cross examination Samson admitted that he may have a defense to a constructive trust claim under 11 U.S.C. § 544[14], but he testified that notwithstanding § 544 a

---

[14]Section 544(a)(3) provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any

15

dispute remains over who is the rightful owner of the proceeds from 650 Woodside.

## DISCUSSION

The Trustee argues that the proposed settlement is fair and equitable, while Misty and Jo Ellen Retz object that it is not. This Court addressed the test for compromise and settlement under F.R.B.P. Rule 9019(a) in *In re Schrock*, 9 Mont. B.R. 414, 416-417 (1991) as follows:

> In *In re Pierce Packing Company*, 6 Mont. B.R. 179, 179-80 (1988) and in *In re Haddock*, 6 Mont. B.R. 263, 265-65 (1988), this Court adopted the test set forth in *In re A & C Properties*, 784 F.2d 1377 (9th Cir. 1986), for approval of a compromise settlement.

> "Although the bankruptcy court has great latitude in authorizing a compromise, it may only approve a proposal that is 'fair and equitable.'" *Woodson v. Fireman's Fund Ins. Co.*, 839 F.2d 610, 620 (9th Cir. 1988) (Citing *Martin v. Kane (In re A & C Properties)*, 784 F.2d1377, 1380-81 (9th Cir.) *cert. denies sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed. 2d 122 (1986). In evaluating a settlement, the Court must consider:

>> '(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views of the premises.' *A & C Properties*, 784 F. 2d at 1381.

> *Woodson*, 839 F. 2d at 620 (additional citation omitted).

> *See also, In re MGS Marketing*, 111 B.R. 264 (9th Cir. BAP 1990). In addition to the four prong test set forth in *A & C Properties*, it is also well established that the

---

knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –

* * * *

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists [and has perfected such transfer].

law favors compromise.  *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976).  In accordance with that principle, Bankruptcy Rule 9019(a) gives this Court broad authority to approve a compromise or settlement.  *In re General Store of Beverly Hills*, 11 B.R. 539, 542 (9th Cir. BAP 1981).  The determination of whether to approve a compromise or settlement is a matter within the sound discretion of this Court.  *Providers Benefit Life Insurance Co. v. Tidewater Group, Inc.*, 13 B.R. 764, 765 (Bankr. N.D.Ga. 1981).  *See also, In re Lions Capital Group*, 49 B.R. 163, 175-76 (Bankr. S.D. N.Y. 1985).

## 1.  First *A&C Properties* Factor – Probability of Success in the Litigation.

### A.  Contentions of the Parties.

Samson contends that Misty's argument, that the constructive trust claim cannot be imposed on a trustee due to strong arm powers, fails in this particular case because TCLLC and Abbey can seek declaratory relief pursuant to F.R.B.P. 7001 that the proceeds are property of TCLLC and not of Brendon's or Misty's bankruptcy estates, and that Misty fails to address that declaratory action which Samson argues would not be time barred.  Samson argues that the evidence shows that Brendon transferred 650 Woodside out of TCLLC  in violation of the operating agreement, that Misty contributed no funds or payments to the purchase, that the Bearberry property which she claims she contributed was purchased by TCLLC from a third party, and that it was transferred to Ryan in violation of the state court order.  Samson explained that he intervened in Adv. 05-5 as trustee for Misty's estate only because her name was on the property transactions, but that she now "is someone who is seeking something for nothing."  Samson asserts he is aware of no facts which would leave him to believe that Misty is entitled to any of the proceeds from 650 Woodside, and he notes that the Agreement has been approved in Brendon's Case No. 04-60302-7 and Adv. No. 05-5.

Abbey/TCLLC contend that TCLLC's claim to the proceeds from the sale of 650

Woodside under the approved settlement Ex. 6 remain viable, and that the Trustee does not become a bona fide purchaser of property merely by entering into a settlement agreement in which he receives sale proceeds.  TCLLC echoes the Trustee's argument that Misty did not contribute any cash down payment or make any payments for 650 Woodside, and failed to show that she had equity in the Bearberry lot, which Matteson testified was acquired by TCLLC from a different party, to exchange for 650 Woodside.  TCLLC argues that Misty did not list 650 Woodside or its transfer in her Schedules and Statement of Financial Affairs, and therefore should not be allowed to consume additional estate assets by claiming an interest in the proceeds from that property now.

Misty argues that the Trustee has not met his burden under the first *A & C* element to show that it is improbable that he would succeed in constructive trust litigation.  Misty accuses Samson of "accepting with total credulity whatever Abbey spoon fed him," and that he did not consult the Retz family or their lawyers to corroborate Abbey's representations, as shown by Samson's ignorance of the equity-for-equity exchange[15].

Misty contends there are three absolute legal defenses to a constructive trust claim.  First, Misty argues that a constructive trust cannot be imposed against a trustee due to his strong arm powers under § 544, citing cases including *Airwork Corporation v. Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638, 642 (9th Cir. BAP 1994).  Second, Misty argues that a constructive trust claim is barred by MCA § 31-2-341 because TCLLC has never filed a claim for relief based on constructive trust and has known about the transfer of 650 Woodside since September of

---

[15]The decision in Adv. No. 05-18 is on appeal and not final.  Misty was not a party in that adversary proceeding.  Therefore, the findings of fact in that decision have no preclusive effect in the instant contested matter, and the record must stand on its own.

2003. Misty argues that MCA § 31-2-341 is a statute of repose, not a statute of limitations, and not subject to equitable tolling. Third, Misty argues that TCLLC's constructive trust claim is time barred because TCLLC and Samson failed to bring "compulsory cross claims" against each other, and so are barred by the settlement in Adv. No. 05-5 which required dismissal of Abbey's claims with prejudice upon execution of the confession of judgment and delivery of the quit claim deed. Misty admits that Ex. 6 "did not, in so many words, provide that Abbey waived or relinquished his constructive trust claims," but contends that an implied reservation of such claims is inconsistent with the express provisions of Ex. 6 that the proceeds were payable to Samson as trustee for Brendon's and Misty's estates and the provision for dismissal with prejudice.

### B. Constructive Trust.

MCA § 72-33-219, provides: "Constructive Trust. A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." Montana law regarding constructive trusts in the Ninth Circuit was discussed in *In re Nava*, 404 F.3d 1119, 1130-31 (9th Cir. 2005):

> The "constructive trust" doctrine "arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." Mont. Code Ann. § 72-33-219. Generally, "fraud, accident, mistake, undue influence, and violation of a trust, or other wrongful acts are the bases upon which a constructive trust is found," but a constructive trust may also be imposed "where a title holder innocently obtained title but would be unjustly enriched if they were allowed to retain the title." *In re Marriage of Moss*, 293 Mont. 500, 977 P.2d 322, 327 (1999). *See also United States v. $4,224,958.57*, 379 F.3d 1146 (9th Cir.2004)("[I]t is hornbook law that, when a fraudster acquired property from a victim by fraud, the fraudster holds the property in constructive trust for his

19

victim." (citing SCOTT ON TRUSTS § 462.4 (4th ed.1989))). "Thus, Montana law
no longer requires a showing of fraud or other wrongful acts as a prerequisite to
imposing a constructive trust...." [*In re Estate of McDermott*, 2002 MT 164, ¶ 25,
310 Mont. 435, 441, ¶ 25, 51 P.3d 486, 491, ¶ 25].

The lack under Montana law of a requirement to show fraud or other active misconduct for the

imposition of a constructive trust places Montana law closer to California law[16] than Arizona

law, which requires active misconduct amounting to fraud to impose a constructive trust as

discussed by the Ninth Circuit in *Mitsui Manufacturers Bank v. Unicom Computer Corp. (In re*

*Unicom Computer Corp.)*, 13 F.3d 32, 325 (9th Cir. 1994) (distinguishing *Torres v. Eastlick (In*

*re North Am. Coin & Currency, Ltd.)*, 774 F.2d 1390 (1985), *cert. denied*, 475 U.S. 1083, 106

S.Ct. 1462, 89 L.Ed.2d 719 (1986)).

Misty contends that MCA § 31-2-341 is a statute of repose which bars Abbey and TCLLC

from asserting a claim of ownership of the proceeds of 650 Woodside based on constructive

trust. MCA § 31-2-341 provides:

Termination of cause of action. A cause of action with respect to a fraudulent transfer
or obligation under this part is terminated unless an action is brought under:

(1) 31-2-333(1)(a) within 4 years after the transfer was made or the obligation was
incurred or, if later, within 2 years after the transfer was or could reasonably have
been discovered by the claimant;

(2) 31-2-333(1)(b) or 31-2-334(1) within 4 years after the transfer was made or
the obligation was incurred; or

(3) 31-2-334(2) within 2 years after the transfer was made or the obligation was
incurred.

Misty's argument that MCA § 31-2-341 time bars a constructive trust claim is not persuasive,

---

[16]"California law provides for the imposition of a constructive trust in a situation
involving simple negligence on the part of a debtor who wrongfully detains another's property."
13 F.3d at 325.

based on the statute's plain language and related statutory provisions.  Section 31-2-341 is found

within Title 31 "Debtor and Creditor Relationships."  Abbey/TCLLC filed the complaint against

Ryan in Adv. No. 05-5, not against Misty.  Samson as Trustee intervened in Adv. No. 05-5, and

no contention is made that his claims to avoid fraudulent transfer were time-barred.

In contrast, a constructive trust claim arises under Title 72, "Estates, Trusts, and Fiduciary

Relationships", and MCA § 72-33-219.  The time limits under § 31-2-341 apply, by its plain

language, with respect to a fraudulent transfer or obligation "under this part," and then lists

specific subsections of §§ 31-2-333 and 31-2-334 to which each time limit applies.  Misty cites

no case authority which holds that a constructive trust claim under MCA § 72-33-219 is a claim

"under this part," and this Court is aware of none.  "Under this part" clearly refers to Part 3 of

Title 31 ("Uniform Fraudulent Transfer Act"), and not to a constructive trust claim arising under

Title 72, MCA.  That interpretation is reflected in the statute immediately following MCA § 31-

2-341.  MCA § 31-2-342, "Supplementary provisions", provides:  "Unless displaced by the

provisions of this part the principles of law and equity . . . or other validating or invalidating

cause, supplement its provisions."

Misty calls MCA § 31-2-341 a statute of repose, but while that statute terminates a claim

under Part 3, Montana's Uniform Fraudulent Transfer Act, this Court is far from persuaded that

it would terminate a claim for constructive trust.  Montana case law provides that the applicable

statute of limitation for a constructive trust claim is MCA § 27-2-202(3) ("The period prescribed

for the commencement of an action upon an obligation or liability, other than a contract, account,

or promise, not founded upon an instrument in writing is within 3 years.").[17]  *Howard v. Dalio* (1991) 249 Mont. 316, 320, 815 P.2d 1150, 1152, (cited in *In re Marriage of Foster*, 2004 MT 326, ¶ 19, 234 Mont. 114,¶ 19, 102 P.3d 16, ¶ 19).  Misty's argument that any constructive trust claim is time-barred by MCA § 31-2-341 is unlikely to succeed on the merits because that section does not appear to terminate constructive trust claims under Montana law.

Yet another flaw in Misty's statute of repose argument is found under the rules allowing amendment and relation back of pleadings.  Rule 15(a), Fed. R. Civ. P., applicable under F.R.B.P. 7015, allows amendment of a party's pleading by leave of court or by written consent of the adverse party, "and leave shall be freely given when justice so requires."  *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990).  It is appropriate to note that the equities in this case weigh strongly in Abbey/TCLLC's favor, based upon the transfer of 650 Woodside in violation of the operation agreement, and Misty's lack of contribution of any funds.  It is also appropriate that given Samson's statements, it is difficult to imagine him withholding his consent to an amended pleading which asserts a constructive trust against the proceeds, and even more difficult for him to prove prejudice as required under *Jackson*.  Rule 15(c)(2) allows for relation back of an amendment when the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading, such as the complaint's factual assertion of constructive trust.  Misty's time bar argument suffers from numerous weaknesses and is unlikely to prevail.

Next Misty argues that a constructive trust claim is barred by settlement because it was

---

[17]This statute of limitation has not been raised by the parties, or discussed, and is not at issue.

not raised as a compulsory cross-claim.  There is no such thing as a "compulsory cross-claim"

under the Federal Rules of Civil Procedure or the Montana Rules of Civil Procedure.  Rule 13 of

both the Federal Rules of Civil Procedure and the Montana Rules of Civil Procedure govern

counterclaims and cross-claims.  Rule 13(a) of both the federal and state rule governs

compulsory counterclaims which require that a "pleading shall state as a counterclaim any claim

which at the time of serving the pleading the pleader has against any opposing party ...."

Although Samson intervened in Adv. No. 05-5 and filed a third party complaint, Ex. 5, the

pleading was against Ryan, not against Abbey or TCLLC and they are not as yet opposing

parties.  Cross-claims against co-parties are provided under Rule 13(g), but they are not

designated "compulsory" and Rule 13(g) provides that a pleading "may state" a cross-claim.

Cross-claims are always permissive, so that a party who decides not to bring a cross-

claim will not be barred by res judicata, waiver or estoppel from asserting it in a later action as

would be the case if the claim was a compulsory counterclaim.  *Whittaker v. Schreiner* (1977),

174 Mont. 232, 235, 570 P. 2d 299, 301 (quoting 6 Wright & Miller, Federal Practice and

Procedure: Cross-claims, pp. 164, 165).  Under Rule 13(g) it is discretionary with the party

whether to assert his claim as a cross-claim or to reserve it for later independent litigation.  *Id.*;

*St. Paul Fire Ins. Co. v. Thompson* (1969), 152 Mont. 396, 561 P.2d 98.  Thus, Misty's argument

that Abbey and TCLLC are barred by their failure to assert a constructive trust as a "compulsory

cross-claim" fails.

Likewise, the Court finds no merit in Misty's defense that Abbey and TCLLC are bound

by the settlement agreement, Ex. 6, which she argues implies no reservation of right to assert a

constructive trust claim or a declaratory action to determine ownership of the proceeds.  Misty

23

provided no evidence in support of her contention, and Samson testified that Ex. 6 did not

include an integration clause, and Ex. 6 does not, in contrast to the proposed Agreement, contain

an "entire agreement" section. Samson testified that he, Abbey, and TCLLC did not include any

restriction against Abbey and TCLLC asserting a claim against the proceeds, and his testimony is

uncontroverted by any evidence. Dye's attorney argument is not evidence.[18] *Hurley v. Student

Loan Acquisition Auth. of Ariz.*, *et al.*, (*In re Hurley*), 258 B.R. 15, 23 (Bankr. D. Mont. 2001)

(An attorney's argument is not evidence); *United States v. Velarde-Gomez*, 224 F.3d 1062, 1073

(9th Cir. 2000); *Exeter Bancorporation v. Kemper Securities Group, Inc.*, 58 F.3d 1306, 1312 n.5

(8th Cir. 1995) (Statements of counsel are not evidence and do not create issues of fact), citing

*United States v. Fetlow*, 21 F.3d 243, 248 (8th Cir. 1994), *cert. denied*, 513 U.S. 977, 115 S.Ct.

456, 130 L.Ed.2d 365 (1994). In light of Samson's sworn testimony on the record, he would

have considerable difficulty in subsequent litigation persuading a court that TCLLC and Abbey

are barred by the settlement in Ex. 6 from asserting a constructive trust claim or ownership in a

declaratory action.

Misty's third legal defense is that a constructive trust is subordinate to the trustee's strong

arm powers. Misty cites *Markair* and other older case law in support of her contention that a

constructive trust is subordinate to a trustee's strong arm power. In *Markair* the Ninth Circuit

_____

[18]Dye was Ryan's attorney and signed Ex. 6. Dye thus had some involvement in the drafting of Ex. 6. Montana Rule of Professional Conduct 3.7(a) bars a lawyer from acting as advocate at trial in which the lawyer is likely to be a necessary witness, unless "(3) disqualification of the lawyer would work substantial hardship on the client." Since Dye did not attempt to testify, it is not known if the exception of Rule 3.7(a)(3) would apply. The effect is that Samson's testimony regarding Ex. 6 not limiting Abbey and TCLLC from asserting a constructive trust claim or seeking declaratory relief of ownership in the proceeds is uncontroverted.

BAP wrote that, while a constructive trust is a flexible and equitable remedy,

> [A] constructive trust cannot affect rights in the res until it is imposed.  A constructive trust imposed by state law prepetition would therefore exclude the res from the debtor estate.  If the remedy remains inchoate post-petition, however, it is subordinate to the trustee's strong arm power.  *In re Tleel*, 876 F.2d 769, 771-72 (9th Cir. 1989).  The incipient beneficiary of a constructive trust has no rights greater than any other creditor of the debtor who has not reduced his claim to judgment and perfected it.

*Markair*, 172 B.R. at 642.

Despite that language the BAP did not decide *Markair* simply on the basis that a constructive trust is subordinate to the trustee's strong arm power.  Instead the BAP applied the test required in the Ninth Circuit in *In re Unicom Computer Corp.*, 13 F.3d 321, 325 (9th Cir. 1994), which it described thus:  "When a creditor can establish that it is entitled to a constructive trust remedy under state law, the burden shifts to the debtor of demonstrating that it would be inequitable as a matter of federal bankruptcy law to impose a constructive trust over those funds."  172 B.R. at 642.

Misty's arguments avoid the merits of whether Abbey/TCCLC is entitled to a constructive trust and focus instead on her three legal defenses.  In this Court's view Abbey/TCLLC have a high likelihood of successfully establishing that they are entitled to a constructive trust under Montana law to prevent Misty's unjust enrichment.  Brendon violated the operating agreement by transferring 650 Woodside to himself and Misty.  She contributed no down payment and made no payments on the mortgage.  Her testimony of the equity exchange of the Bearberry property is contradicted by Matteson's testimony that TCLLC acquired Bearberry from a different party.  Misty testified that documentary evidence exists of the transfer of the Bearberry lot in exchange for 650 Woodside, but she did not produce such evidence at trial.  She

25

also did not call Brendon, who has not objected to the Agreement, to testify to the existence of the purported equity-for-equity exchange. "[F]ailure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it." *N.L.R.B. v. Advance Transp. Co.*, 965 F.2d 186, 195 (7th Cir. 1992), quoting *P.R. Mallory Co. v. NLRB*, 400 F.2d 956, 959 (7th Cir.1968), *cert. denied*, 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969). Misty's testimony regarding the equity exchange is uncorroborated and subject to the presumption against her for failing to produce the documentary evidence to which she alluded.

TCLLC/Abbey likely can establish that they are entitled to a constructive trust under Montana law, and therefore the burden shifts to Misty under *Unicom* and *Markair* to demonstrate that it would be inequitable as a matter of federal bankruptcy law to impose the constructive trust. *Unicom*, 13 F.3d at 321; *Markair*, 172 B.R. at 642. Misty asserts the trustee's strong arm powers under § 544(a)(3) as a bona fide purchaser, but under the circumstances of this particular case and Ninth Circuit law, that assertion likely is not sufficient to satisfy her burden.

*Unicom* distinguished *North American Coin & Currency*, in which nothing appeared in the record to warrant imposition of a constructive trust under Arizona law, with its own facts where the debtor wrongfully and through its own mistake acquired funds belonging to another and had only bare legal title. 13 F.3d at 325. The Ninth Circuit concluded that the debtor-in-possession failed its burden: "Because we find nothing that would warrant overriding the dictates of California law in favor of some unspecified, overarching principle(s) of federal bankruptcy law, we hold that a constructive trust in favor of Mitsui arose over the funds represented by Pitney's misdirected check." *Id.*, 13 F.3d at 325. That quote ended with footnote

26

6, which is quoted in its entirety because of its statement regarding *North American Coin & Currency*, a case relied on by the BAP in *Markair*:

> In reaching this conclusion we necessarily reject the BAP majority's holding that our opinion in *In re North American Coin & Currency, Ltd.* created an elaborate, multi-part test to determine whether and under what circumstances a constructive trust may be imposed on property of a debtor or of a bankruptcy estate.  Our decision in *In re North American Coin & Currency, Ltd.* should not be read as saying more than what it actually says; *viz.*, that while state law must be the starting point in determining whether a constructive trust *may* arise in a federal bankruptcy case, that law must be applied in a manner not inconsistent with federal bankruptcy law.

*Unicom*, 13 F.3d at 325 n.6.

The BAP in *Markair*, as Misty urges, affirmed the bankruptcy court's discretion to refuse to apply a constructive trust remedy based on § 544(a) as an "overriding bankruptcy principle." 172 B.R. at 641, 642.  The BAP's reasoning demonstrates critical distinctions from the case at bar:

> Assuming *arguendo* that Airwork has established its state law rights, where a creditor can assert only that its rights to the res would arise solely on a debtor-creditor relationship, the debtor's burden can be established as a matter of law: [T]he creditor has not established any basis to be placed ahead of other creditors of the estate.  Airwork has not established that it is entitled to treatment different than any other creditor that extended credit to the debtor, other than the superficial appeal of the existence of the res.

> \* \* \* \*

> If a constructive trust would have been the proper state remedy to prevent Markair's unjust retention of the res, that remedy was inchoate when the estate was formed, and the trustee, representing the creditors of the estate, may defeat its application pursuant to § 544(a).  Therefore, the bankruptcy court was correct when it held that even if Airwork would have been entitled to a remedy of a constructive trust, the court could properly refuse to award one pursuant to overriding bankruptcy considerations.  In effect, since the res is not retained by the debtor under these circumstances, but is ratably distributed to its creditors, no unjust enrichment is presented, and the basis for the remedy is dissipated.

27

*Markair*, 172 B.R. at 642.

"Analysis focuses on the legal relationship between the parties. If no debtor-creditor relationship exists or was intended, a trust will exclude property from the estate." *Markair*, 172 B.R. at 641. Misty has objected to allowance of Abbey/TCLLC's claim in this case, arguing that Proof of Claim No. 5 should be disallowed. Abbey/TCLLC filed Proof of Claim No. 5, but its basis is the fraudulent transfer of 650 Woodside and it cannot be reasonably argued that they ever intended a debtor-creditor relationship with Misty. Abbey/TCLLC arguably have established a reasonable basis that they are entitled to treatment different than any other creditor as called for by the BAP in *Markair*.

Where the BAP provides in *Markair* that a trustee may defeat a constructive trust pursuant to § 544(a) because it is inchoate when the estate was formed, 172 B.R. at 642, that rule would not apply in the instant case because when the estate was formed 650 Woodside was not property of the estate. It had been transferred to Ryan, and Misty did not list it or its transfer in her Schedules and Statements, and did not amend. Samson took possession of the proceeds pursuant to the settlement of Adv. No. 05-5 and holds them as Trustee of Brendon's estate, where the settlement has been approved without objection, not in Misty's estate.

In discussing the interaction of state law and 11 U.S.C. § 541(a) this Court has written: "The bankruptcy estate succeeds to no more interest than the Debtor possessed or had, and the estate takes its interest subject to such conditions." *Richardson v. Becker*, 19 Mont. B.R. 404, 407, quoting *In re Kleffner*, 14 Mont. B.R. 10, 15 (Bankr. D. Mont. 1994) (other citations omitted). The status of property consisting of recovered preferential and fraudulent transfers, such as the recovered 650 Woodside, is discussed in *In re Advent Management Corp.*, 104 F.3d

28

293, 295 (9th Cir. 1997):

> While the Bankruptcy Code does not define "an interest of the debtor in property," the United States Supreme Court has interpreted the term to mean "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). Under § 541(d) of the Bankruptcy Code, "property of the estate" includes all property in which the debtor has legal title except "to the extent of an equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d) (West 1993).

> In the case of funds held by a debtor in constructive trust for another person, the equitable interest in the trust funds belongs to the trust beneficiary, not the debtor. Accordingly, this court held in *Unicom* that funds held by a debtor in constructive trust are neither "property of the estate" under § 541(d), nor "an interest of the debtor in property" under § 547(b). [*Mitsui Mfrs. Bank v. Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir. 1994)].

No question of tracing arises in the instant case as existed in *Advent Management.* Thus, Misty is left with the burden of proving that it would be inequitable under federal bankruptcy law to impose a constructive trust over the proceeds from 650 Woodside, and that § 544(a) is an overriding principal of federal bankruptcy law which warrants overriding the dictates of Montana law. This Court deems it likely that the Trustee[19] would be unlikely to prevail on the merits of such litigation because Misty contends that Abbey/TCLLC is not a creditor, the proceeds were not part of the estate when it was formed and cannot be property of the estate or an interest of the debtor in property under *Advent Management.* 104 F.3d at 295. It would be futile to apply § 544(a), and Abbey/TCLLC can show that they are entitled to treatment different than other creditors who extended credit to the debtor. *See Markair*, 172 B.R. at 638. Misty has failed her burden under *Unicom*, 13 F.3d at 325.

The above discussion regarding constructive trust claims are separate from the Trustee's

---

[19]Samson argues that he is not likely to prevail on the merits.

argument that a separate, undefined theory of ownership to the proceeds could be advanced by Abbey/TCLLC in a declaratory action under Rule 7001. Misty did not address that contention so it is uncontested and it must be presumed that the estate is unlikely to prevail in the merits of such a declaratory action. The first *A & C Properties* factor weighs considerably in favor of approval of the Agreement.

### 2. Second Factor - Difficulties of Collection.

Misty did not raise this factor in her objection, and in her brief, states it is not at issue because Samson has possession of the proceeds from 650 Woodside. Hence, no difficulties of collection in case the matter was litigated exist.

### 3. Third Factor – Complexity of Litigation, Expense, Inconvenience and Delay.

Misty did not raise the third factor in her objection, and Samson and TCLLC did not address it in their brief. In her brief Misty recognizes the litigiousness between these parties and that this factor "could weight [sic]" in favor of settlement, but nonetheless argues that the three defenses she raises based on the strong arm powers, statue of repose and settlement could be raised in a motion to dismiss under Rule 12 or a Rule 56 motion for summary judgment.

Based on the discussion of the three defenses above, in this Court's view, a motion to dismiss or motion for summary judgment based on those three defenses would not have a high likelihood of success, and the matter would have to proceed to trial. The record in Adv. No. 05-18, and the hearing on the Trustee's instant Motion, and the other proceedings involving these parties show that development of the record regarding the transfers of 650 Woodside is complex and would require a contested hearing lasting several hours if not days, including considerable expense and inconvenience to parties who may reside out of state. The evidence shows that

Misty's estate has limited funds, which would rapidly be expended given the litigiousness which Misty acknowledges. The Court concludes that this factor weighs firmly in favor of settlement.

### 4. **Fourth Factor**.

The fourth *A & C* factor is the paramount interest of the creditors and a proper deference to their reasonable views in the premises. Misty and Jo Ellen argue that Samson plainly failed to satisfy this element since Misty's creditors would receive nothing under the Agreement and Samson admitted not contacting the creditors to obtain their input. Samson argues that no funds exist in the estate except proceeds from jewelry in the Trustee's possession, which he would have to expend to defend against a declaratory action if brought by TCLLC to determine that the sale proceeds are TCLLC's property, thus diminishing the funds in Misty's estate available to pay creditors.

The creditors include TCLLC/Abbey and Jo Ellen, and objections to both of their claims are pending. The fourth factor requires a "proper" deference to creditors' "reasonable" views. Given the above discussion and conclusion that Samson's admission that he has no reasonable likelihood of success, the litigiousness, complexity and expense which further litigation would entail, the Court concludes that the fourth factor weighs in favor of settlement. TCLLC/Abbey support approval of the Agreement while Jo Ellen opposes it. The other creditors presumably wish to receive as much of a pro rata distribution as possible rather than seeing limited estate assets consumed by the Trustee litigating a case in which he has admitted he is not likely to prevail. Jo Ellen seeks to continue litigation on the grounds that Abbey is not entitled to any of the proceeds. Given the evidence above that Misty contributed no money down, no payments, or equity which was not in violation of the operating agreement, the Court views Jo Ellen's view to

31

continue litigating this matter as not reasonable.

In conclusion, for the above reasons, applying its discretion and after review of all four of the *A & C Properties* factors and finding three of the four factors in favor of settlement, the Court finds that the proposed Agreement Regarding Sale Proceeds is fair and equitable and satisfy the requirements of F.R.B.P. 9019(a).

**IT IS ORDERED** a separate Order shall be entered in conformity with the above overruling to the objections filed by Misty Retz and Jo Ellen Retz, granting the Trustee's Motion to approve Agreement Regarding Sale Proceeds and approving that Agreement.

BY THE COURT

Ralph B Kirscher

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana